UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JEREMY BRODIE,                          :
                                        :CIVIL ACTION NO. 3:18-CV-0300
            Plaintiff,                  :
                                        :(JUDGE CONABOY)
            v.                          :
                                        :
NANCY A. BERRYHILL,                     :
Acting Commissioner of                  :
Social Security,                        :
                                        :
            Defendant.                  :

---

## MEMORANDUM

Pending before the Court is Plaintiff's appeal from the Acting Commissioner's denial of Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). (Doc. 1.) Plaintiff protectively filed his application on August 31, 2016, alleging disability beginning on February 1, 2014. (R. 16.) After Plaintiff appealed the initial March 21, 2017, denial of the claim, a hearing was held by Administrative Law Judge ("ALJ") Randy Riley on September 5, 2017. (Id.) ALJ Riley issued his Decision on September 19, 2017, concluding that Plaintiff had not been under a disability as defined in the Social Security Act ("Act") from August 31, 2016, through the date of the decision. (R. 23.) Plaintiff requested review of the ALJ's decision which the Appeals Council denied on December 12, 2017. (R. 1-7.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R.

1.)

Plaintiff filed this action on May 1, 2018. (Doc. 1.) He asserts in his supporting brief that the Acting Commissioner's determination should be reversed or remanded for the following reasons: 1) the ALJ failed to find that Plaintiff's mental heatlh conditions met a listed impairment at step three; 2) the ALJ erred in his findings of fact regarding Plaintiff's suicidality; and 3) the ALJ's residual functional capacity assessment is not supported by substantial evidence because it does not properly take into account the opinions of treating and examining providers. (Doc. 10 at 12.) For the reasons discussed below, the Court concludes Plaintiff's appeal is properly denied.

## I. Background

Plaintiff was born on June 26, 1975, and was forty-one years old on the date the application was filed. (R. 22.) Plaintiff has a high school education and does not have past relevant work. (R. 23.) In the September 20, 2016, Disability Report, Plaintiff alleged that his ability to work was limited by PTSD, depression, bipolar disorder, anxiety, and OCD. (R. 152.)

### A. *Medical Evidence*

Plaintiff was incarcerated on his alleged disability onset date of February 1, 2014, and was seen on several occasions by

Jennifer Dylewski, MHM, P.C.R.N.P. (*See* R. 247-52.) In a Psychiatric Progress Note dated January 27, 2014, Plaintiff reported that he was feeling "good," "more hopeful," and functioning well. (*Id.*) Ms. Dylewski found Plaintiff's affect was constricted and she did not otherwise note any mental health problems. (*Id.*) His diagnosis was depressive disorder ("311") and a history of substance abuse. (Id.) Ms. Dylewski assessed a GAF score of 65. (*Id.*) Plaintiff was directed to continue taking Paxil and return in twelve weeks. (*Id.*) In April 2014, Ms. Dylewski noted that Plaintiff reported he was "good," he had stopped medications a month earlier, and he had no depressive signs. (R. 248.) She also noted Plaintiff's depression was "in full remission" and follow up would be as needed. (*Id.*) In May Plaintiff reported that he was worried about how he would cope when he was released. (R. 247.) Ms. Dylewski found his mood to be anxious and depressed but he refused medication. (*Id.*) She encouraged Plaintiff to return to outpatient treatment when he was released. (*Id.*) Plaintiff again reported feeling good in July 2014. (R. 251.) Having noted Plaintiff stated "I can't wait to drink," Ms. Dylewski found his insight was limited regarding addiction. (*Id.*) No other problems were noted in her mental status findings. (*Id.*)

Post-release records begin with a December 7, 2016, initial visit to Momentum Services, LLC. (R. 259-71.) Plaintiff's chief complaint was PTSD and he said he was seeking treatment for his feelings of severe depression and suicidal ideation. (R. 259.) He reported that he "'stabbed, shot, and hurt a lot of people'" in his life and he was willing to work to overcome his depression but was not hopeful that he would get better. (*Id.*) Though Plaintiff said he had regularly had suicidal ideation since he was sixteen, he said he hadn't acted because he felt that he had "unfinished business" or "was put on this earth for a reason." (*Id.*) Plaintiff also reported "Current Behavior Changes" of sadness, frequent crying spells, decrease in daily activities, changes in sleep patterns, feelings of hopelessness, inability to concentrate, withdrawal from family, and problems with impulse control. (*Id.*) Mental Status Exam showed the following: well-groomed appearance; poor eye contact; cooperative attitude; restless motor activity; alert with no cognition impairment; normal rate, volume and prosody regarding speech; coherent, goal-directed, concrete thought process; thought content included "Delusions: Religious" and no other problem; suicidal ideation, intent and plans with the notation added that Plaintiff was "trying very hard not to follow through"; no homicidal ideation; anxious and sad mood; and flat

4

affect. (R. 267-68.) Plaintiff was diagnosed with PTSD and agreed to seek further treatment. (R. 271.) Plaintiff was again seen at Momentum on December 21, 2016, (R. 273-76.)

Plaintiff was admitted to Roxbury Treatment Center on January 10, 2017, on a 201 legal status (voluntary commitment) upon referral from Carlisle Medical Center where he had presented with increased depression, suicidal ideations, increased anxiety, and flashbacks about his past violent history. (R. 278.) At the time, Plaintiff was unemployed, living with his girlfriend, and trying to get disability. (*Id.*) Mustafa Kaleem, M.D., completed the Inpatient Psychiatry Discharge Summary.[1] (R. 278-81.) The report included an extensive review of Plaintiff's background and mental health problems where Dr. Kaleem stated that Plaintiff had an "extensive history of legal issues as well as drug and alcohol issues." (R. 278.) Dr. Kaleem further noted

> this patient reports that he used to be a gang member when he was very young. He was . . . involved in drug and alcohol issues, violence, shootouts, and illegal activities. . . . Jeremy says that he left that lifestyle of being a gang member when he was in his early 20s . . . but continues to have history of robbing people, fighting, selling drugs,

---

[1] The Discharge Summary was dictated and transcribed on February 15, 2017. (R. 281.) In his residual functional capacity assessment explanation, ALJ Riley referred to statements from Dr. Kaleem found in the Discharge Summary as statements made on February 15, 2017. (R. 21.)

using drugs, and all the illegal activities. He also had spent time in State Penitentiary as well as in county jail. He also had collected DUI's, domestic violence issues, drug related charges, and also currently is on probation. He was in prison from 2012 until 2015 and after that he was in various halfway house and rehab centers before he was released and he started living with his stepfather in a hotel room in efficiency about six months ago. He stayed with the father for four months and then moved back to Shippensburg with his girlfriend and her kids. Jeremy's mother and sister lives [sic] in the apartment upstairs from his girlfriend's apartment and Jeremy says that they have their own mental health issues and their presence around him makes him very frustrated, angry, and agitated.

Jeremy says that he uses cannabis and uses it really heavily. He uses four to five times a day and when he does not use it he feels very depressed, frustrated, he cannot eat, he feels as if there is no future for him, and starts feeling hopeless and helpless. He also says that he can do anything to get marijuana including robbing people, stealing, and getting into fights and says that marijuana is the drug of choice for him.

Jeremy says that he is tired of the lifestyle he has been living. He wants to put his life on track, but somehow he has not been able to do it and says that he is feeling very depressed and frustrated about that. Jeremy says that he regularly develops the flashbacks and nightmares about getting jumped on, shot out, worrying people, fighting with people, selling drugs, using drugs all the time and that makes him feel frustrated, angry, and agitated. Jeremy says that his anxiety also gets out of control, he develops panic attacks and he starts crying. Jeremy also verbalizes symptoms of depression including hopeless, helplessness, frustration, difficulty sleeping, feeling of worthless and guilt, psychomotor agitation,

6

anger, being tired, and having difficulty focusing and concentrating.

Jeremy says that immediate reason for admission was that he got into an argument and fight with his girlfriend and after the fight he felt as if he would lose her. He says he already does not have much. He involved [sic] in domestic violence, he is on parole, he does not have a job, cannot get Disability, cannot see his kids as much as he wants to, and he does not want to go back to jail. He continues to use marijuana and at times does illegal things and felt as if everything is getting out of control and he did not need to live like this anymore. He also develops temper tantrums, anger, and also had cravings for marijuana. He says all of this was making him feel so much depressed and frustrated that he did not want to live anymore. He punched the wall and there were some few bruises and broken skin on the knuckles. He also cut himself superficially on the arm and at that point in time the girlfriend made him go to the hospital.

Jeremy denies any manic symptoms ever, though says that he becomes talkative and starts having racing thoughts when he uses drugs or when he withdraws from the drugs. Denies any history of psychosis, eating disorder, or OCD symptoms. Jeremy says that he does have anger issues and many times he feels like breaking stuff, starting fight with people, hitting people. He says he does not want to do it, but he does it all the time because he feels like doing it and because it makes him feel good, as he does not know how else to feel good and better. Jeremy also reports difficulty sleeping and says that his life is very disorganized and he feels very overwhelmed and frustrated.

<u>Substance Abuse History:</u> Jeremy says that he started using weed at age 15 and says that he has done every drug on the street throughout his life. He also had used alcohol, but he does not care about drugs and alcohol. His

> drugs [sic] of choice is weed and he says
> that these days he spends almost $20 per day
> on weed and uses it four to five times a day
> even though he does not have any source of
> income, but he says he is able to get it in
> one way or the other either by selling it, by
> hustling, and his girlfriend also buys that
> for him too. Jeremy says that he goes into
> withdrawal when he does not use cannabis. He
> was in rehab twice in the past, once in
> Roxbury Treatment Center about 10 years ago
> and also in ADAPPT Program in Reading in the
> past. Jeremy says that he can do anything for
> marijuana including stealing, ripping people
> off, breaking into people's houses, robbing
> people, conning people, etc. Jeremy says that
> the only sobriety period he ever had from
> drugs and alcohol was when he was in prison.

(R. 278-79.) Mental Status Examination at the time of discharge on January 17, 2017, indicated that Plaintiff had a restricted affect and was somewhat anxious. (R. 281.) He continued to have lability of mood at times and low frustration tolerance but he strongly denied suicidal or homicidal ideations, he did not have "any other psychotic symptoms except for some paranoia every now and then," and his insight and judgment were still limited but were improving. (Id.) His discharge diagnosis was Unspecified Depressive Disorder; Unspecified Anxiety Disorder; PTSD; Antisocial Personality Disorder; Cannabis Use Disorder, Severe; History of Polysubstance Use Disorder; R/O Substance Induced Depressive Disorder/Anxiety Disorder. (Id.) Discharge medications were Risperdal, Remeron, Prilosec, and Neurontin. (Id.) The Discharge Plan was for

8

Plaintiff to attend an individual therapy session at Momentum Services on January 20, 2017, and a medication management appointment on March 1, 2017. (*Id.*) Dr. Kaleem noted that Plaintiff declined all other services. (*Id.*)

The record contains no indication that Plaintiff attended either the individual therapy or medication management appointment but he was seen as a new patient by Page M. Kissinger, C.R.N.P., at Summit Primary Care on February 10, 2017. (R. 339.) She recorded that Plaintiff presented to discuss medications, he reported anxiety, depression, and insomnia, and he said he wanted to get disability so he could overdose on drugs. (R. 339.) No problems were noted on physical exam. (*Id.*) He was assessed to have a mood disorder "due to known physiological condition with depressive features" and PTSD. (R. 340.) Ms. Kissinger adjusted Plaintiff's medication regimen and planned to see him for follow up in one month. (*Id.*)

On March 7, 2017, David Baker, Psy.D., conducted a Mental Status Evaluation. (R. 348-52.) Dr. Baker noted that Plaintiff had three psychiatric hospitalizations the first of which reportedly occurred about 1990, the second approximately 2010 and

the third in January at Roxbury Hospital.[2] (R. 348.) He also
noted that Plaintiff had recently begun receiving psychotropic
medication management at Summit Health but, because Plaintiff
recently lost his insurance, he did not expect to be able to
return. (R. 349.) Plaintiff reported depressive symptoms;
transient suicidal ideation; anxiety-related symptoms; a trauma
history including seeing and having involvement in violence,
murder, and rape; panic attacks; and manic symptoms including
frequent mood instability and anger management issues. (*Id.*)
Plaintiff denied thought disorder symptoms and generally denied
cognitive symptoms and deficits. (*Id.*) Mental Status Examination
indicated the following: no noted problems with appearance, speech,
or thought processes; depressed and apathetic affect; apathetic
mood; intact attention and concentration; intact memory skills;
apparently above average intellectual functioning and appropriate
general fund of knowledge; limited insight; and fair judgment. (R.
350-51.) Dr. Baker diagnosed unspecified bipolar disorder and
related disorder, depressed, moderate to severe without psychotic
features; PTSD; antisocial personality disorder with borderline

---

[2] Dr. Baker's evaluation dates the Roxbury admission as
January 2016. (R. 348.) The Court assumes this to be the January
2017 admission as no January 2016 admission is contained in the
record.

10

personality features; substance use disorder, alcohol, severe; and polysubstance use disorder, in sustained remission. (R. 352.) Dr. Baker recommended individual psychotherapy, psychiatric intervention, and medical followup and evaluation as needed. (*Id.*) He thought Plaintiff would need therapy for more than two years and found his prognosis to be guarded given the severity of Plaintiff's psychiatric symptoms. (*Id.*)

On April 12, 2017, Plaintiff was seen at Sadler Health Center by Kristen Ruis, LCSW, and Gordon Miller, D.O. (R. 358-61.) Ms. Ruiz noted Plaintiff had numerous issues and diagnoses, he was struggling with lack of transportation, his girlfriend had left, he was trying to get disability, and he had no money. (R. 358.) Mental Status exam showed that Plaintiff was alert and oriented to all spheres; mood depressed; affect congruent; normal thought process; appropriate eye contact; good memory; normal speech; intact insight; and intact judgment. (*Id.*) Ms. Ruiz assessed severe depression for which Plaintiff would continue his medication regimen, receive additional counseling, and see a psychiatrist. (*Id.*) Plaintiff reported that he had an appointment later that day at NHS Stevens Center. (*Id.*)

Plaintiff returned to Summit Primary Care on April 20, 2017, at which time Ms. Kissinger noted he had been seen at the Sadler

11

Health Center and Stevens Center and he was to return to the Stevens Center the following week. (R. 366.) Ms. Kissinger reported that Plaintiff had been taking Neurontin and Risperdal and was tolerating the medications well, he appeared to be less negative and have a brighter outlook than at his previous visit, and was "doing the best that he can to get his care and mental health care completed." (R. 366.) Plaintiff said his anxiety and depression had improved. (*Id.*) Physical exam revealed no problems. (R. 366-67.) Regarding mood and affect, Ms. Kissinger stated that Plaintiff displayed "cooperation during encounter" and his affect was appropriate to his mood. (R. 367.)

The April 21, 2017, initial Client Treatment Plan from NHS Stevens Center completed by Jennifer McClellan indicates that Plaintiff would be treated for severe depression, PTSD, anxiety, and substance abuse. (R. 377.)

NHS Stevens Center's Brian Long, M.D., conducted a Psychiatric Evaluation on May 9, 2017. (R. 375-76.) He noted Plaintiff was self-referred and, by history, he reported low self-esteem, selling drugs since he was sixteen, violence done to him and perpetrated by him, nightmares, flashbacks including some related to his jail experience totaling six years, hyperarousal, hypervigilance, and trust issues. (R. 375.) Plaintiff also reported that he used

12

canabis regularly and it was effective to self-treat his feelings. (Id.) He denied other drug use and destructive impulses at the time. (R. 375.) Mental Status Exmination showed the following: Plaintiff was alert and fully oriented; his eye contact was decidedly poor though he was pleasant, respectful, and polite; he was cooperative; his speech was clear and coherent; his mood was euthymic and somewhat bland; his affect was fairly constricted; his thoughts were goal-directed and logical without evidence of psychotic content; he had no evident suicidal or homicidal ideations; his cognition was fully intact, including concentration, attention, and memory for recent and remote events; his impulse control was mostly intact; and his judgment and insight were fairly good. (R. 376.) Dr. Long diagnosed PTSD and Cannabis Use Disorder, Moderate. (Id.) The Plan included individual psychotherapy and a resource coordinator. (Id.) Dr. Long noted that no medications were indicated at the time and Plaintiff was instructed to go off Risperdal which had been prescribed while Plaintiff was inpatient in January 2017. (Id.) Plaintiff indicated he was comfortable with the plan and he would return in two weeks. (Id.)

The NHS July 25, 2017, Client Treatment Plan completed by Agnes Ruiz indicates that Plaintiff had progressed from his prior

13

treatment plan in that he presented as stable on no medication regimen and he continued to follow up with the psychiatrist. (R. 372.) Plaintiff's strengths were noted to be that he wanted to move forward with his life and barriers to treatment were "'irritability, temper, over sensitive.'" (*Id.*)

**B. *Opinion Evidence***

**1. <u>Consulting Examiner Opinion</u>**

Dr. Baker completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on March 7, 2017. (R. 353-55.) Regarding Plaintiff's ability to understand, remember, and carry out instructions, Dr. Baker reported that Plaintiff had no restrictions in his ability to understand and remember simple instructions and his ability to carry out simple instructions; he had mild restrictions in his abilities to make judgments on simple work-related decisions and understand and remember complex instructions; he had a moderate restriction in his ability to carry out complex instructions; and he had a marked restriction in his ability to make judgments on complex work-related decisions. (R. 353.) Dr. Baker identified the severity of Plaintiff's psychiatric symptoms as the basis for the assessments. (*Id.*) Regarding Plaintiff's ability to interact appropriately with supervisors, co-workers, and the public, as well as respond to changes in a routine

14

work setting, Dr. Baker opined that Plaintiff had a moderate restriction in his ability to interact appropriately with the public and marked restrictions in his abilities to interact appropriately with supervisors and co-workers, and to respond appropriately to usual work situations and to changes in a routine work setting. (R. 354.) He again identified the severity of Plaintiff's symptoms as the basis of his findings. (*Id.*) Dr. Baker noted that alcohol and/or substance abuse contributed to the limitations assessed and he did not know what changes he would make to his answers if Plaintiff were abstinent, but he found it likely that psychiatric symptoms alone (with personality features) would significantly impair Plaintiff's judgment and concentration. (*Id.*)

**2.   State Agency Consultant Opinion**

On March 20, 2017, State agency consultant Karen Weitzner, Ph.D., reviewed evidence, including Dr. Baker's opinion, and completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment (R. 71-78.) She concluded Plaintiff had mild limitations in hid ability to understand, remember, or apply information; moderate limitations in his ability to interact with others; moderate limitations in concentration, persistence, or pace; and moderate limitations in his abilities to adapt and manage himself. (R. 74.) In the Mental Residual Functional Capacity

15

Assessment, Dr. Weitzmer determined that Plaintiff had no worse than moderate limitations in the areas identified. (R. 76-77.) Regarding interacting with others, she stated that Plaintiff "has a history of assaultive behavior, particularly when he was involved in gangs and drugs. He is no longer involved in such activity." (R. 77.) Dr. Weitzner also explained that Plaintiff "reports anger management difficulties, though he has shown improvement over time." (*Id.*) She noted that she had considered Dr. Baker's opinion and had given it partial weight. (*Id.*)

### 3. Psychiatrist Opinion

On June 7, 2017, Dr. Long, the psychiatrist who had conducted the initial NHS Stevens Center evaluation on May 9, 2017, completed a Franklin County Domestic Relations Physician's Information Request. (R. 369.) On the form, Dr. Long identified Plaintiff's diagnosis to be "post traumatic condition," he noted that he first treated Plaintiff on May 9, 2017, and saw him the same day as he filled out the form, he expected Plaintiff to be treated for one year, his condition was chronic, and his prognosis was fair. (*Id.*) He indicated that Plaintiff was on no medications at the time. (*Id.*) In response to the question regarding Plaintiff's present capacity to work, he checked the box for "total disability" and identified "limited attention and anxiety" as the cause. (*Id.*)

Dr. Long opined that the period of disability would be from May 9, 2017, through May 8, 2018, and he identified May 8, 2018, as the date Plaintiff would be able to return to work. (*Id.*)

## C. Hearing Testimony

At the September 5, 2017, ALJ hearing, Plaintiff testified extensively about his activities and limitations. (R. 32-45.) He said he "smoke[d] weed sometimes" if he was "having a real bad anxiety or depression," and he was on medications but he had not been taking anything "lately" because he hadn't "gone through the motions" with the nurse practitioner to get the prescription updated and the medication did not seem to make much difference. (R. 35-36.) When ALJ Riley asked Plaintiff why he thought he could not do a regular job, Plaintiff responded that

> part of it would be having to get there. And
> wanting to care enough to get there. And if
> I get through that part, then my issues with
> people. I just have a scary short fuse when
> it comes to the way people talk to me, or how
> they talk to me, or what they say, or how
> they come across.

(R. 36.) Plaintiff described anxiety attacks, flashbacks, and nightmares and confirmed that he avoided certain situations like bars, parties, and large crowds. (R. 38.) He said he still cared about painting, drawing, tattooing, and writing, but he really didn't do those things anymore. (R. 38.) Plaintiff expressed

17

suicidal ideation but no present intent. (R. 36-37, 40.) He described struggles trying to better himself and difficulties with energy, attention, concentration, and memory. (R. 40.) Regarding concentration and attention, Plaintiff added that, if he cared about something, he didn't "do too bad." (R. 41.) Plaintiff elaborated about his problems getting along with people, including authority figures, and how he tried to cope with handling his anger, including walking away from the situation. (R. 41-43.)

ALJ Riley asked Vocational Expert Michael Kibler ("VE") to assume a hypothetical individual of Plaintiff's age, education, and work experience who could do work

> limited to simple, routine, repetitive tasks in a work environment free from fast-paced production. Involving only simple work-related decisions with few, if any, work place changes. No interaction with the public. Occasional interaction with co-workers, but no tandem tasks. And occasional supervision. . . . And we just keep it at the light level.

(R. 46.) The VE testified that such an individual could perform the exemplary jobs of bakery racker, egg candler, and bindery machine feeder offbearer. (*Id.*) Adding the limitations that the individual could not engage in sustained work activity on a regular basis for eight hours a day, five days a week, for a forty-hour week, the VE said the individual would be unemployable. (R. 46-

18

47.)

Plaintiff's attorney then posed a hypothetical questions asking about an individual with marked difficulties interacting with supervisors and co-workers as well as marked difficulties responding appropriately to usual work settings and to changes in a routine work setting would be able capable of any work activity. (R. 47.)  The VE responded that such an individual would be unemployable.  (*Id.*)

D.   *ALJ Decision*

In his September 9, 2017, Decision, ALJ Riley found that Plaintiff had the severe impairments of alcoholism, cannabis use disorder, PTSD, depression, anxiety, and antisocial personality disorder.  (R. 18.)  He concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  (*Id.*)  ALJ Riley specifically determined that Plaintiff had moderate limitations regarding criteria set out in "paragraph B" of the identified mental impairment listings.  (R. 18-19.)

ALJ Riley then assessed Plaintiff to have the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following nonexertional limitations:

The claimant's work is limited to simple,

19

> routine and repetitive tasks in a work
> environment free from fast paced production
> involving only simple work related decisions
> with few, if any, work place changes. The
> claimant should have no interaction with the
> public. He is limited to occasional
> interaction with co-workers but with no
> tandem tasks. Furthermore, the claimant is
> limited to occasional supervision.

(R. 20.) After noting that Plaintiff had no past relevant work, ALJ Riley concluded that jobs existed in significant numbers in the national economy which he could perform. (R. 23.) He, therefore, found that Plaintiff had not been under a disability as defined in the Act since August 31, 2016, the date the application was filed. (R. 23.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[3] It is necessary for the

---

[3] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). The Act further provides that an individual is disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he

20

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant

> lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that jobs existed in significant numbers in the national economy which Plaintiff could perform.  (R. 23.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a

> quantitative exercise. A single piece of
> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence. Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion. *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted). The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted). If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result

but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See, e.g., Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Finally,

an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

As set out above, Plaintiff asserts the Acting Commissioner's determination should be reversed or remanded for the following reasons: 1) the ALJ failed to find that Plaintiff's mental heatlh conditions met a listed impairment at step three; 2) the ALJ erred in his findings of fact regarding Plaintiff's suicidality; and 3) the ALJ's residual functional capacity assessment is not supported by substantial evidence because it does not properly take into account the opinions of treating and examining providers. (Doc. 10 at 12.)

### A. *Step Three*

Plaintiff claims the ALJ erred at step three when considering listings 12.04, 12.06, 12.08, and 12.15 and failed to find that his ability to interact with others and his abilities regarding concentration, persistence, or pace were at least marked. (Doc. 10 at 17-19.) Defendant responds that substantial evidence supports the ALJ's step three finding. (Doc. 12 at 5.) The Court concludes Plaintiff has not satisfied his burden of showing the claimed error is cause for reversal or remand.

A claimant bears the burden of establishing that his impairment meets or equals a listed impairment. *Poulos v. Comm'r of Social Security*, 474 F.3d 88, 92 (3d Cir. 2007). In general, "the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Under paragraph B of the identified listings, a plaintiff must show that her impairment results in an extreme limitation in one or marked limitation in two of the following categories: 1) understanding, remembering, or applying information; 2) interacting with others; 3) concentrating, persisting, and maintaining pace; or 4) adapting or managing self. *See, e.g.*, 20 C.F.R. pt. 404, subpt. P, App'x 1, at § 12.04(B). A "marked" restriction is one that is more than moderate but less than extreme and that interferes "seriously" with an ability to function independently, appropriately, effectively, and on a sustained basis. *Id. at* § 12.00F2.

While ALJ Riley does not provide extensive discussion regarding his finding on the issue of interacting with others, he juxtaposes Plaintiff's testimony about limitations with evidence that Plaintiff shops in stores (thus interacting with people) and was cooperative with a mental health provider. (R. 19 (citing Exs. B6E/5, 6 [R. 186, 187], B4F/11 [R. 267]).)

In support of his claimed error regarding the ability to

interact with others, Plaintiff first cites his testimony about difficulties in this area. (Doc. 10 at 17-18 (citing R. 34, 36, 39-42).) Plaintiff also points to the following: December 2016 Momentum records noting that he had poor eye contact and was withdrawing from his family (Doc. 10 at 18 (citing R. 259-71)); inpatient treatment notes that he had homicidal ideations, presented as somewhat paranoid and inappropriate, and had difficulty controlling his emotions (*id.* (citing R. 332-27)); and a treating psychiatrist's notations that Plaintiff reported hyperarousal, hypervigilance and trust issues, trouble with irritability, temper, and oversensitivity and his eye contact was "decidedly poor" (*id.* (citing R. 372-376)).

The cited evidence points to sporadic problems but does not satisfy Plaintiff's burden at step three in that it does not show his restriction related to interacting with others is marked because the cited evidence does not establish that he has had a serious limitation to act appropriately in this area "*on a sustained basis.*" *See, e.g., Yoder v. Colvin*, No. 3:16-CV-212, 2016 WL 3940712, at *12 (M.D. Pa. July 21, 2016) (emphasis added). Although records from the Pennsylvania Department of Corrections ("DOC") show that Plaintiff had mental health treatment while he was incarcerated, the provider recorded in April 2014 that

27

Plaintiff's depression was "in full remission" after Plaintiff reported he was "good," he had stopped taking medications a month earlier, and he had no depressive signs. (R. 248.) At his last DOC mental health visit in July 2014, Plaintiff again reported feeling good (although the provider reported that his insight was limited regarding addiction.) (R. 251.) The record does not indicate that Plaintiff received further mental health treatment before applying for SSI on August 31, 2016.

The record shows Plaintiff sought mental health treatment over three months after he applied for benefits when he visited Momentum Services on December 7, 2016. (R. 259.) Initial Visit notes identify his mental-health related symptoms as "Current Behavior Changes." (Id.) In the following three months, evidence shows Plaintiff had increased symptoms, including inpatient hospitalization from January 10, 2017, to January 17, 2017, and began to take medication to address his mental health problems. (R. 278-81, 339-40, 350-52, 358-61.) However, at an April visit to his primary care provider, Ms. Kissinger noted that Plaintiff was tolerating his medications well, he was less negative and had a brighter outlook than at his February visit, Plaintiff reported his anxiety and depression had improved, and no problems were reported on physical examination. (R. 366-67.)

A day after his primary care visit, Plaintiff was seen at NHS Stevens Center for the first time and notes indicate he would undergo a psychiatric evaluation and be treated for severe depression, PTSD, anxiety, and substance abuse. (R. 377.) At the May 9th evaluation by psychiatrist Brian Long, M.D., Plaintiff reported that regular cannabis use was effective to self-treat his feelings. (R. 375.) He denied other destructive impulses at the time. (*Id.*) Limited problems were noted on Mental Status Exam. (R. 376.) These included findings that Plaintiff had decidedly poor eye contact (though he was pleasant, respectful, and polite), his mood was somewhat bland (but euthymic), impulse control was mostly intact, and judgment and insight were fairly good. (*Id.*) Dr. Long diagnosed PTSD and Cannabis Use Disorder, Moderate. (*Id.*) The Plan included individual psychotherapy and a resource coordinator. (*Id.*) Dr. Long noted that no medications were indicated at the time and Plaintiff was instructed to go off Risperdal which had been prescribed while Plaintiff was inpatient in January 2017. (*Id.*) Plaintiff indicated he was comfortable with the plan and he would return in two weeks. (*Id.*)

The NHS July 25, 2017, Client Treatment Plan completed by Agnes Ruiz indicates that Plaintiff had progressed from his prior treatment plan in that he presented as stable on no medication

regimen and he continued to follow up with the psychiatrist. (R. 372.) Plaintiff's strengths were noted to be that he wanted to move forward with his life and barriers to treatment were "'irritability, temper, over sensitive.'" (Id.)

This summary of Plaintiff's treatment history shows that his self-reported difficulties were not consistently reported to providers. It further shows that Plaintiff showed improvement when treated by the DOC in 2014 and in the course of his post-incarceration treatment spanning the period of early December 2016 through July 2018. Thus, despite Plaintiff's cited testimony about numerous difficulties interacting with others (Doc. 10 at 17-18 (citations omitted)), the record does not support a conclusion that Plaintiff experienced these difficulties "on a sustained basis" during the relevant time period.[4] *See Yoder*, 2016 WL 3940712, at

---

[4] Plaintiff's assertion in his reply brief that the ALJ's RFC finding that he should have no interaction with the public showed he had more than a moderate impairment in his ability to interact with the general public (Doc. 15 at 2) does not provide the suggested support for a finding of marked limitations in the ability to interact with others. ALJ Riley specifically noted that "paragraph B" assessments are not a residual functional capacity assessment which requires a more detailed assessment. (R. 19.) Giving the benefit of the doubt to a claimant's subjective complaints in the RFC assessment is not inconsistent with a less limiting step three determination. *See, e.g., Fullen v. Comm'r of Soc. Sec.*, 705 F. App'x 121, 124 (3d Cir. 2017) (not precedential).

*12 (citation omitted).

Similarly, Plaintiff does not point to substantial evidence which shows he had a marked limitation in concentration, persistence, or pace. (Doc. 10 at 19.) Plaintiff primarily relies on his testimony about related issues. (*Id.*) The only non-testimonial record cited is Dr. Long's opinion that Plaintiff was totally disabled from May 9, 2017, to May 8, 2018, due in part to his limited attention. (*Id.* (citing R. 369-70).) However, reliance on this record is undermined by the fact that Dr. Long rendered the opinion on his second meeting with Plaintiff and, at his first meeting less than a month earlier, Dr. Long found "[c]ognition is fully intact, including concentration, attention, and memory for recent and remote events" (R. 376). Although the clinical setting is distinct from the work setting, *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000), and Dr. Long was opining on Plaintiff's ability to work, his May 9th examination findings and lack of treatment history with Plaintiff indicate his opinion was based only on Plaintiff' subjective complaints. This is not generally problematic in the mental health arena where conditions are necessarily and largely diagnosed on the basis of a patient's subjective complaints. *See, e.g.*, *Hall v. Astrue*, 882 F. Supp. 2d 732, 740 (D. Del. 2012). However, in this case Plaintiff's

subjective complaints and opinions are also reviewed in the context of Dr. Long's finding that no medications were indicated in May 2017 and Plaintiff was determined to be stable on no medication in July 2017 (R. 376, 372). Thus, Dr. Long's isolated June 2017 opinion that Plaintiff was disabled due in part to limited attention and Plaintiff's subjective complaints do not show that he had a marked limitation in this area.

## B. *Suicidality*

Plaintiff contends the ALJ erred in his consideration of Plaintiff's suicidal ideation. (Doc. 10 at 21-22.) Defendant responds that substantial evidence supports the evaluation of Plaintiff's alleged suicidality. (Doc. 12 at 9.) The Court concludes Plaintiff has not satisfied his burden of showing that the alleged error is cause for reversal or remand.

ALJ Riley acknowledged that Momentum Service records from December 2016 showed that Plaintiff had suicidal ideations and current suicidal ideation and intent. (R. 21 (citing Ex. B4F/7 [R. 263]).) He acknowledged the January 2017 inpatient psychiatric hospitalization. (*Id.* (citing Ex. B5F/2 [R. 278]).) He acknowledged primary care provider records from February 2017 that Plaintiff "cannot wait to get disability so that he can overdose on drugs." (*Id.* (citing Ex. B12F/1 [R. 364]).)

Although Plaintiff claims that if "his suicidality had been properly addressed, there is a reasonable expectation that the ALJ's RFC findings would have prohibited full-time work on a regular and continuing basis given the effect Brodie's suicidal thoughts would have had on his mental functioning" (Doc. 15 at 3), the evidence cited and a review of ALJ Riley's decision do not support this conclusion.  The fact that Plaintiff had three hospitalizations for "psychiatric reasons" (Doc. 10 at 21) over a period spanning more than twenty-five years (*see* R. 375) is not indicative of the suicidality claimed by Plaintiff.  The fact that he was hospitalized in part for increased suicidal ideation in January 2017 (*id.*) is not indicative of suicidal ideation which would interfere with mental functioning to the degree suggested based on the treatment and symptom timeline set out in the previous section of this Memorandum: Plaintiff showed improvement and stability following the hospitalization and was taking no psychotropic medication from May 2017 at least through July 2017. *See supra.*  For similar reasons, cited testimony from Plaintiff's September 2017 hearing regarding suicidality (Doc. 10 at 22) does not show that "his attention and concentration would be substantially impaired" (Doc. 10 at 22) on a regular basis such that he would be incapable of substantial gainful activity.

33

As reviewed above, ALJ Riley clearly acknowledged Plaintiff's suicidal ideation. (*See* R. 21.) The conclusion that Plaintiff's cited evidence does not satisfy his burden of showing the ALJ improperly considered his suicidality is bolstered by other evidence of record. For example, the record shows that, although Plaintiff reported "transient suicidal ideation" at his March 7, 2017, Mental Status Evaluation (R. 349), thereafter he did not express suicidal ideation to providers (*see*, *e.g.*, R. 366, 376). On July 25, 2017, NHS Stevens Center Client Treatment Plan notes indicate Plaintiff's "Strength[]" was that "he wanted to move on with his life." (R. 372.) Thus, a contextual review of Plaintiff's suicidality does not show that the ALJ erred in his analysis by not considering it to have had a greater effect on his residual functional capacity.

## C. *Mental Health Opinions*

Plaintiff asserts that the ALJ's RFC assessment is not supported by substantial evidence because it does not properly take into account the opinions of Dr. Baker, the consulting examiner, and Dr. Long, a treating medical provider, and improperly gave more weight to the State agency consultant. (Doc. 10 at 23-27.) Defendant responds that substantial evidence supports the ALJ's evaluation of medical source opinions. (Doc. 12 at 15.) The Court

concludes Plaintiff has not satisfied his burden of showing that the claimed error is cause for remand.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.[5]  *See, e.g., Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit.  *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986).  The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory

---

[5]  Though not applicable here, the regulations have eliminated the treating source rule for claims filed after March 27, 2017, and in doing so have recognized that courts reviewing claims have "focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our decision."  82 FR 5844-01, 2017 WL 168819, *at 5853 (Jan. 18, 2017).  The agency further stated that in its experience in adjudicating claims using the treating source rule since 1991, the two most important factors for determining persuasiveness are consistency and supportability, which is the foundation of the new regulations.  *Id.*  Therefore, the new regulations contain no automatic hierarchy for treating sources, examining sources, or reviewing sources, but instead, focus on the analysis of these factors.  *Id.*

diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).[6] "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of

---

[6] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); *see also Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

Under the currently applicable regulation, more weight is generally given to a medical source who has examined the plaintiff than to the opinion of a medical source who has not. 20 C.F.R. § 404.1527(c)(1).

ALJ Riley gave more weight to the State agency consulting psychologist, Dr. Weitzner, than to the consulting examiner, Dr. Baker, and the treating psychiatrist, Dr. Long. (R. 22.) Plaintiff maintains the opinions of Dr. Baker and Dr. Long support a finding of disability and are at least entitled to deference as they are consistent with Plaintiff's testimony and the record as a whole. (Doc. 10 at 24-26.) Plaintiff also points to error in the ALJ's reliance on Dr. Weitzner's opinion because she did not review

the whole record, including the opinion of the treating psychiatrist. (*Id.* at 26.)

First, as discussed above, Plaintiff's testimony is not consistent with the treatment records as a whole. Second, although the examining doctors were entitled to rely on Plaintiff's subjective complaints, *Morales*, 225 F.3d at 319; *Hall*, 882 F. Supp. 2d at 740, their limited contact with him did not provide context for their assessment of his subjective complaints.[7] Further the mental status examination findings of Dr. Baker and Dr. Long did not support the limitations assessed. For example, Dr. Baker found that Plaintiff's assessed limitations were based on the severity of Plaintiff's psychiatric symptoms (R. 353-54) yet the only problems noted on examination were depressed and apathetic mood and affect, limited insight, and fair judgment (R. 350-51); Dr. Long opined that Plaintiff was unable to work because of his limited attention and anxiety (R. 369) yet in Dr. Long's only mental status exam of record he found that Plaintiff was alert and fully oriented, his thoughts were goal-directed and logical, his cognition was "fully intact, including concentration, attention,

---

[7] It does not appear that either doctor reviewed records from other acceptable sources in conjunction with the evaluations. (*See* R. 348, 375-76.)

and memory for recent and remote events," his impulse control was mostly intact, and his insight and judgment were fairly good (R. 376). These examples and the limited contact between the providers and Plaintiff, in addition to noted improvement subsequent to Dr. Baker's assessment (R. 366-67) and Dr. Long's assessment (R. 372) indicate Plaintiff's general averments that the ALJ erred in assigning these opinions less weight than that assigned to the State agency consultant do not support the claimed error. Seen in the relevant regulatory framework, the opinions of Dr. Baker and Dr. Long were not based on a treatment relationship of any length or frequency of examination; the doctors did not have knowledge of Plaintiff's mental impairments beyond that gleaned from his presentation and representations during their limited direct contact with him; the opinions did not present relevant evidence to support the assessments; and the opinions were not consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(2)-(4).

Plaintiff's criticism of reliance on the State agency opinion on the basis that Dr. Weitzner did not review Dr. Long's records (Doc. 10 at 26-27) is unavailing in that, as discussed above, Dr. Long's limited contact with Plaintiff and inconsistent findings undermine reliance on his opinion. Contrary to Plaintiff's assertion that ALJ Riley engaged in lay interpretation of the

record to reject Dr. Long's assessment, this is a rare case where a conflict between Dr. Long's sole treatment records of May 9, 2017, and his Franklin County Domestic Relations' form notation regarding attention and anxiety are apparent on their face and subsequent records from Dr. Long's facility (NHS Stevens Center) show improvement (R. 372). Thus, no "lay interpretation of the evidence" (Doc. 10 at 27 (citing *Morales*, 225 F.3d 310; *Brown v. Astrue*, 649 F.3d 193 (3d Cir. 2011); *Washburn v. Colvin*, No. 1:15-CV-674, 2016 WL 6136589 (M.D. Pa. Nov. 29, 2016); SSR 96-6p)) was needed to determine that Dr. Long's opinion was not entitled to controlling weight.

### V. Conclusion

Because Plaintiff has failed to show that any of the claimed errors are cause for reversal or remand, his appeal of the Acting Commissioner's denial of benefits (Doc. 1) is properly denied. An appropriate Order is filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge


DATED: September 13, 2018


40